**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

Case No.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY and STATE FARM FIRE
AND CASUALTY COMPANY,

      Plaintiffs,

v.

COLONIAL MEDICAL CENTER,
INC. d/b/a KISSIMMEE MEDICAL &
WELLNESS CENTER, and
CESAR N. ABIERA, M.D.,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire"), bring this complaint against Colonial Medical Center, Inc. d/b/a Kissimmee Medical & Wellness Center ("Colonial Medical Center") and Cesar N. Abiera, M.D. ("Dr. Abiera") (collectively "Defendants") and allege as follows:

### I.    NATURE OF THE ACTION

1.    This action involves an unlawful and fraudulent scheme orchestrated by Defendants to obtain payments from State Farm Mutual and State Farm Fire through the submission of thousands of medical bills and related records for services purportedly provided to individuals involved in automobile accidents and eligible for Personal Injury Protection

Coverage ("PIP Benefits") and Medical Payments Coverage ("MPC") (collectively, "No-Fault Benefits") under State Farm Mutual and State Farm Fire automobile insurance policies.

2.    The chiropractic and medical services rendered at Colonial Medical Center were unlawful because Colonial Medical Center and Dr. Abiera failed to comply with their statutory and administrative medical director obligations, including the failure to:

a.    ensure all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided;

b.    provide day-to-day supervision of Colonial Medical Center;

c.    conduct systematic reviews of Colonial Medical Center's bills to ensure they were not fraudulent or unlawful;

d.    take immediate, corrective action upon discovery of an unlawful charge at Colonial Medical Center; and

e.    ensure copayments and deductibles were collected from patients as required by law.

Thus, the claims and charges related to the services performed at Colonial Medical Center were not compensable under Florida law. *See* Fla. Stat. § 400.9935(3) ("A charge or reimbursement claim made by or on behalf of a clinic . . . that is otherwise operating in violation of this part . . . is an unlawful charge and is noncompensable and unenforceable.").

3.    Additionally, the services provided by Colonial Medical Center were false, misleading, incomplete, deceptive, and fraudulent, and thus, unlawful and noncompensable because the treatment was not based on each patient's unique and individual needs, but was instead provided pursuant to a medically unnecessary predetermined treatment plan (the "Predetermined Treatment Plan"), which included:

a.    failing to legitimately examine patients to determine the true nature and extent of their injuries;

b.     assigning a predetermined diagnosis of non-specific, soft-tissue injuries in multiple regions of the spine;

c.     determining almost all patients had an emergency medical condition ("EMC") to allow Colonial Medical Center to bill and obtain more than the $2,500 cap on PIP Benefits that applies when an EMC is not present;

d.     ordering MRIs for almost all patients regardless of whether the MRIs were indicated, the results of which had no impact on diagnoses or treatment;

e.     implementing an identical treatment plan for virtually all patients comprising the same six services, which included five passive modalities (hot and/or cold packs, electrical stimulation, manual therapy, chiropractic manipulations, and ultrasound) and one purportedly active therapy (therapeutic exercise), for as long as possible to maximize Defendants' receipt of patients' No-Fault Benefits;

f.     submitting documents to State Farm Mutual and State Farm Fire that falsely represented the services and goods provided to the patients were medically necessary and lawfully rendered when, in fact, they were not medically necessary or lawfully rendered;

g.     performing final examinations in which nearly every patient reportedly suffered from permanent impairments, despite purportedly receiving the extensive battery of services in the Predetermined Treatment Plan; and

h.     waiving the collection of copayments and deductibles as an inducement for patients to commence and continue treatment.

4.     As a result of the Predetermined Treatment Plan: (a) patients were not legitimately examined, diagnosed, or treated for conditions they may have had; (b) patients were subjected to medically unnecessary and unlawfully rendered services, regardless of their unique needs; and (c) patients' limited No-Fault Benefits were exhausted or substantially reduced and therefore not available for medically necessary treatment they may have needed.

5.     Dr. Abiera established, implemented, and was a knowing and active participant in the scheme employed by Colonial Medical Center as he performed the clinic's fraudulent medical examinations and EMC determinations. To further the scheme, Dr. Abiera failed to

conduct systematic reviews of Colonial Medical Center's bills to ensure they were not fraudulent or unlawful and failed to take the corrective action he was bound to perform as Colonial Medical Center's medical director.

6.      This action asserts common law claims for fraud and unjust enrichment, as well as statutory claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Florida Statutes §§ 501.201-501.213) to recover actual damages of at least $3.89 million paid to Colonial Medical Center, plus costs and reasonable attorneys' fees for violations of FDUTPA.  This action also seeks a declaratory judgment that State Farm Mutual and State Farm Fire are not liable for any unpaid charges Colonial Medical Center has submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire to the extent the charges relate to claims in which services were not lawfully rendered and/or not medically necessary.

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (a) a substantial part of the events giving rise to State Farm Mutual's and State Farm Fire's claims occurred in this judicial district; and (b) one or more Defendants reside in this judicial district and all Defendants reside in Florida.

### III.    THE PARTIES

#### A.    Plaintiffs

9.    State Farm Mutual is a citizen of the state of Illinois.  It is incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Mutual is authorized to conduct business in Florida and issues automobile insurance policies in Florida.

10.    State Farm Fire is a citizen of the state of Illinois.  It is incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Fire is authorized to conduct business in Florida and issues automobile insurance policies in Florida.

#### B.    Defendants

11.    Colonial Medical Center is a Florida corporation that operates from two locations: (a) 717 Altaloma Ave., Suite B, Orlando, Florida 32803 and (b) 705 East Oak Street, Suite A, Kissimmee, Florida 34744.[1]  Laypersons James Lee Eaker and Wendell Bruce Eaker each hold a 50% ownership interest in Colonial Medical Center. Colonial Medical Center tendered (and continue to tender) charges for reimbursement for its health care services to insurance companies like State Farm Mutual and State Farm Fire. With regard to each patient listed in **Exhibit 1**, Colonial Medical Center submitted one or more claims for payment of No-Fault Benefits to State Farm Mutual or State Farm Fire. The insurers, to which Colonial Medical Center regularly submitted bills for reimbursement, constitute third-party payors, which rendered Colonial Medical Center a health care clinic as defined by the HCCA. *See* Fla.

---

[1] 717 Altaloma Ave., Suite B, Orlando, Florida 32803 is Colonial Medical Center's principal place of business.

Stat. § 400.9905(4); Fla. Admin. Code R. 59A-33.006(14). At all times relevant to this action, Colonial Medical Center's Orlando and Kissimmee locations maintained health care clinic licenses issued by Florida's Agency for Health Care Administration ("AHCA"). Dr. Abiera, as medical director, agreed in writing to accept legal responsibility for Colonial Medical Center's  activities, as specified in Florida Statutes § 400.9935, by signing Health Care Licensing Applications for the renewal of Colonial Medical Center's health care clinic licenses for its Orlando and Kissimmee locations on August 16, 2012 and August 13, 2014 respectively.

12.     Dr. Abiera resides in and is a citizen of the State of Florida. Dr. Abiera has been licensed in Florida as a medical doctor since 1987. Dr. Abiera has purported to be the statutorily designated medical director at Colonial Medical Center since approximately 2001.

## IV.    RELEVANT BACKGROUND

### A.    The Health Care Clinic Act

13.     In 2003, the Florida Legislature enacted the Health Care Clinic Act ("HCCA") (Florida Statutes §§ 400.990-400.995) based on its finding that "the regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers."  Fla. Stat. § 400.990(2).  The express purpose of the HCCA "is to provide for the licensure, establishment, and enforcement of basic standards for health care clinics and to provide administrative oversight by the Agency for Health Care Administration."  *Id.*

14.     The HCCA makes it unlawful for clinics to operate without a license from AHCA unless they meet one of the enumerated exceptions in the HCCA (which are not applicable here). Fla. Stat. § 400.991.

15.     In furtherance of the HCCA's goal of clinic oversight, where a clinic is owned by a non-qualified lay person, a licensed clinic must "appoint a medical director . . . who shall agree in writing to accept legal responsibility" for various activities identified in the HCCA. Fla. Stat. § 400.9935(1).  A "medical director" is "a physician who is employed or under contract with a clinic and who maintains a full and unencumbered physician license in accordance with chapter 458, chapter 459, chapter 460, or chapter 461."  Fla. Stat. § 400.9905(5) (defining "medical director").

16.     The HCCA sets forth duties medical directors must perform on behalf of licensed clinics, including, but not limited to, the duty to "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful" and "[u]pon discovery of an unlawful charge . . . take immediate corrective action."  Fla. Stat. § 400.9935(1)(g). Medical directors are also required to "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."  Fla. Stat. § 400.9935(1)(d).

17.     AHCA promulgated certain regulations to clarify a medical director's duties under the HCCA:

> A licensed health care clinic may not operate or be maintained without the ***day-to-day supervision*** of a single medical . . . director as defined in Section 400.9905(5), F.S.  The health care clinic responsibilities under Sections 400.9935(1)(a)-(i), F.S., cannot be met without an ***active***, appointed medical . . . director.  Failure of an appointed medical . . . director to substantially comply with health care clinic responsibilities under Rule 59A-33.012, F.A.C. and Sections 400.9935(1)(a)-(i), F.S., shall be grounds for the revocation or suspension of the license and assessment of a fine pursuant to Section 400.995(1), F.S.

Fla. Admin. Code R. 59A-33.008(1) (emphasis added).

18.     If a clinic's medical director fails to satisfy his or her statutory and administrative duties, then the clinic is operating in violation of Florida Statutes § 400.9935 and any charge submitted by such clinic "is an unlawful charge and is noncompensable and unenforceable." Fla. Stat. § 400.9935(3).

**B.     The Florida Motor Vehicle No-Fault Law**

19.     Under the Florida Motor Vehicle No-Fault Law (the "No-Fault Law"), each automobile owner or leasee is required to maintain, and each insurer is required to issue, a minimum amount of personal injury protection insurance coverage payable without regard to who is at fault in causing an accident. *See* Fla. Stat. §§ 627.730-627.7405. Automobile insurers like State Farm Mutual and State Farm Fire are required to provide PIP Benefits of at least $2,500, and up to $10,000 if the patient is determined to have an EMC, for losses resulting from injuries arising out of the ownership, maintenance, or use of a motor vehicle.

20.     Under this coverage, insurers are required to pay 80% of all reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services related to injuries caused by the accident up to the applicable cap of either $2,500 or $10,000. Fla. Stat. § 627.736(1)(a).

21.     Under the No-Fault Law, "medically necessary" means "a medical service or supply that a prudent physician would provide for the purposes of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is: (a) [i]n accordance with generally accepted standards of medical practice; (b) [c]linically appropriate in terms of type, frequency, extent, site, and duration; and (c) [n]ot primarily for the convenience of the patient, the physician, or other health care provider." Fla. Stat. § 627.732(2)(a)-(c).

22.     State Farm Mutual and State Farm Fire are required to pay or deny claims for PIP Benefits within 30 days, and may be ordered to pay interest and attorney's fees if they fail to pay the amount determined to be owed within that 30-day time period. *See* Fla. Stat. § 627.736(4)(b) and (d).

23.     Neither an insurer nor an insured is required to pay a claim or charge: (i) for services or treatment that were not lawful at the time rendered; (ii) to any person who knowingly submits a false or misleading statement relating to the claim or charges; or (iii) for any bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.  Fla. Stat. § 627.736(5)(b)(1)(b)-(d).  In this context, the No-Fault Law's billing requirements provide–among other things–all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of CPT codes. *See* Fla. Stat. § 627.736(5)(d). The CMS guidelines for the completion of HCFA-1500 forms make clear that, in Box 31 of the HCFA-1500 form, health care providers must set forth the name of the individual who either personally performed or directly supervised the underlying health care service. *See* Medicare Claims Processing Manual, Chapter 26, Item 31. Accordingly, health care providers that misrepresent, in their PIP billing, the identities of the individuals who personally perform or directly supervise the underlying health care services, or the nature, extent, and medical necessity of the underlying services, are not entitled to receive PIP benefits. *See* Fla. Stat. § 627.736(5)(b) and (d). In the context of the No-Fault Law, "lawful or lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and

administrative requirements of state and federal law related to the provision of medical services or treatment." Fla. Stat. § 627.732(11).

24.    MPC is an optional insurance coverage that provides reimbursement benefits that are supplemental to PIP Benefits.  MPC covers the 20% copayment for PIP Benefits for which the insured otherwise would be responsible and allows an insured to elect additional medical coverage above the PIP Benefits minimum policy limits required by Florida law. Similar to the law governing PIP Benefits, pursuant to State Farm Mutual and State Farm Fire's applicable car insurance policies, MPC coverage is only available for medically necessary and lawfully rendered treatment. *See* State Farm Car Policy 9810A, p. 18-24.

25.    Colonial Medical Center secured assignments of No-Fault and MPC Benefits from State Farm Mutual and State Farm Fire insureds and Colonial Medical Center and Dr. Abiera used these assignments to submit claims and charges directly to State Farm Mutual and State Farm Fire for services and treatments rendered to State Farm Mutual's and State Farm Fire's insureds. *See* Date of Service Summary, attached as **Exhibit 2**.

**C.    The Legitimate Treatment of Patients with Soft-Tissue Injuries**

26.    Colonial Medical Center purported to examine, diagnose, and treat patients who had been in automobile accidents and complained of neck and/or back pain, among other ailments.

27.    For patients who have been in automobile accidents and have legitimate complaints of neck and/or back pain, or other ailments, a provider must take a detailed patient history and perform a legitimate examination to arrive at a legitimate diagnosis.

28.     Based upon a legitimate diagnosis, a licensed health care professional must engage in medical decision-making to design a legitimate treatment plan tailored to the unique circumstances of the patient. During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

29.     Legitimate treatment plans for patients with soft tissue injuries such as strains and sprains may involve no treatment at all because many of these kinds of injuries heal without any intervention, or a variety of interventions, including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

30.     Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities, including: (a) hot/cold packs, (b) ultrasound, (c) electrical stimulation, (d) manual therapy, (e) massage, and (f) traction. Active modalities require affirmative movement by patients and include a wide variety of exercises, strengthening, and stretching tailored to the unique circumstances of each patient, including the nature and location of the injuries, the patients' physical abilities, and the patients' response (or lack thereof) to any particular active modality on any day or over time.

31.     In legitimate treatment plans, passive modalities should generally be used only if necessary to reduce pain and facilitate active modalities, while active modalities should generally be introduced as soon as practicable to promote the actual healing of strains and sprains.

32.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary

depending on the unique circumstances of each patient, including: (a) the patient's age, social, family, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

33.     Treatment plans should be periodically reassessed and modified based upon the progress of the patient, or lack thereof.  To the extent diagnostic tests such as x-rays and MRIs are medically necessary and are performed, in a legitimate clinical setting, the results would be documented and evaluated in the patient's medical chart and would impact treatment plans.

34.     Patients should be discharged from treatment when they have reached maximum medical improvement ("MMI"), such that no further treatment is likely to benefit the patient, or when patients fail to respond to the treatment program.

35.     The above-described process of examination, diagnosis, and treatment must be appropriately documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patient, whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm Mutual and State Farm Fire, so they can pay for reasonable and necessary treatment.

36.     As described below, Colonial Medical Center and Dr. Abiera failed to legitimately examine, diagnose, or treat patients for their unique conditions and needs.  Instead, patients were subjected to the Predetermined Treatment Plan, in which they received virtually the same services to exploit their No-Fault Benefits, rather than to address their unique conditions and needs.  Furthermore, the pervasive patterns in the examination findings and

other services that Colonial Medical Center submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire are not credible and reflect services performed pursuant to the Predetermined Treatment Plan, rather than because they were medically necessary to address the unique conditions and needs of each patient.

## V.    THE ILLEGAL SCHEME

### A.    Colonial Medical Center and Its Medical Director, Dr. Abiera, Failed to Comply with Florida Law In Performing Their Duties

37.    Colonial Medical Center and Dr. Abiera, the medical director for Colonial Medical Center's Orlando and Kissimmee locations, did not fulfill their duties under the HCCA.

38.    Dr. Abiera failed to ensure all health care practitioners at Colonial Medical Center had active appropriate certification or licensure for the level of care being provided as required by Florida Statutes § 400.9935(1)(d).

39.    Therapeutic exercise (CPT code 97110), the only active therapy included in the Predetermined Treatment Plan, and manual therapy (CPT code 97140) were performed by registered chiropractic assistants ("RCAs") and certified chiropractic physician's assistants ("CCPAs").

40.    The RCAs and CCPAs who worked for Colonial Medical Center were not qualified to perform therapeutic exercise and manual therapy. The American Medical Association's ("AMA") *Current Procedural Terminology* ("*CPT Manual*"), Fourth Edition,

makes clear these are skilled therapeutic procedures that must be performed by a "physician or other qualified health care professional."[2]

41.    The *CPT Manual* defines a "physician or other qualified health care professional" as:

> [A]n individual who is qualified by education, training, licensure/regulation (when applicable), and facility privileging (when applicable) who performs a professional service within his or her scope of practice and independently reports that professional services.

42.    The *CPT Manual* expressly distinguishes a "physician or other qualified health care professional" from "clinical staff." The *CPT* defines "clinical staff" as:

> [A] person who works under the supervision of a physician or other qualified health care professional, and who is allowed by law, regulation and facility policy to perform or assist in the performance of a specific professional service, but does not individually report that professional service.

43.    RCAs and CCPAs were "clinical staff" because they were required to work under the supervision of a chiropractic physician and thus, were prohibited from performing therapeutic exercise and manual therapy with patients at Colonial Medical Center. *See* Fla. Stat. §§ 460.4166(1)-(2) and 460.4165(2). Consequently, the RCAs and CCPAs who worked for Colonial Medical Center were not properly licensed to perform therapeutic exercise and

---

[2] Colonial Medical Center is bound by the AMA's coding requirements. The No-Fault Law expressly mandates that all claims for PIP benefits comply with the *CPT Manual*:

> All billings for such services rendered by providers must, to the extent applicable, comply with the CMS 1500 form instructions, **the American Medical Association CPT Editorial Panel**, and the Healthcare Common Procedure Coding System (HCPCS); and **must follow the Physicians' Current Procedural Terminology (CPT)**, the HCPCS in effect for the year in which services are rendered, and the International Classification of Diseases (ICD) adopted by the United States Department of Health and Human Services in effect for the year in which services are rendered.

Fla. Stat. § 627.736(5)(d) (emphasis added).

manual therapy. Defendants knew the RCAs and CCPAs were performing these modalities without a license, yet allowed the RCAs and CCPAs to unlawfully perform the treatment and bill for it to maximize the Colonial Medical Clinic's revenue. Defendants also allowed this unlawful treatment to be billed to State Farm Mutual and State Farm Fire using the name of a licensed medical professional (oftentimes a chiropractor) to conceal the fraud and give the impression the treatment was being lawfully rendered by a properly licensed practitioner or medical professional, when it was not.

44.     Dr. Abiera also did not perform any oversight or other functions required under the law as the medical director and failed to provide day-to-day supervision of Colonial Medical Center as required by Florida Administrative Code Rule 59A-33.008(1).

45.     Dr. Abiera was only present at Colonial Medical Center one day per week, and nearly all of his time was committed to patient examinations.  *See* **Exhibit 3** (Sept. 17, 2013 Dr. Abiera Dep. Tr. 9:15-17 ("I see anywhere from 25 to 30 patients when I go in there")). In this regard, Dr. Abiera played a critical role in Colonial Medical Center's scheme. He was the only medical doctor who worked for Colonial Medical Center and was the only health care professional qualified to assess patients with an declare that patients had EMCs, which was an integral part of the Predetermined Treatment Plan.

46.     Other than treating patients, Dr. Abiera purportedly spent five to ten minutes per month reviewing ten pre-selected bills and did not perform any other functions or oversight as the medical director at Colonial Medical Center.

47.     Dr. Abiera did not review any of Colonial Medical Center's contracts, did not have knowledge of the clinic's billing practices, and was not informed or involved in the day-

to-day supervision or operations of the clinic as required under Florida law. *See* Fla. Stat. § 400.9935(1); Fla. Admin. Code R. 59A-33.008(1).

48.     Dr. Abiera also failed to properly ensure copayments and deductibles were collected from patients. The No-Fault Law requires the insurer to pay 80% of all reasonable charges. *See* Fla. Stat. § 627.736(1)(a). The remaining 20% copayment is the obligation of the insured. As the Southern District has recognized, the Florida legislature enacted the copayment requirement:

> [T]o create a negative incentive for insureds to control their consumption of medical services. That is, if insureds are required to pay a deductible every time they visit a medical clinic, they will be less likely to make unnecessary visits to the medical clinic.

*United Auto. Ins. Co. v. Fla. Wellness & Rehab. Ctr.*, No. 08-20348-CIV, 2009 WL 10667729, at *2 n.2 (S.D. Fla. Feb. 11, 2009).

49.     However, some PIP clinics often waive (or never intend to collect) copayments or deductibles from the patients and agree (or intend) to collect only the fees received from insurers as payment in full.

50.     The Insurance Fraud Statute (Florida Statutes § 817.234) expressly makes the "general business practice" of waiving or failing to collect copayments or deductibles "insurance fraud." The Insurance Fraud Statute provides:

> It shall constitute a material omission and insurance fraud, punishable as provided in subsection (11), for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge[.]

Fla. Stat. § 817.234(7)(a).

51.     In addition to the express prohibition by the Insurance Fraud Statute, the general practice of waiving copayments or deductibles also creates a misrepresentation regarding the clinic's "usual and customary charge" in contravention of the No-Fault Law. *See* Fla. Stat. § 627.736(5)(a) (providing a clinic cannot charge an insurer an amount that "exceed[s] the amount the person or institution customarily charges for like services or supplies.").

52.     Dr. Abiera testified under oath he was not involved in the collection of copayments from patients:

Q.     Does the clinic take co-payments from the patients?
A.     I'm not sure about that. You'd have to ask the corporate office, the billing office, because **I don't really get involved with payments.**
Q.     So you think as a medical director you don't have any responsibility to determine whether or not the co-payment is being accepted from the patient?
                                    …
A:· **I never did it**.· You know, that's always been another office and **I don't get involved with that**.

*See* **Exhibit 4** (Sept. 13, 2018 Dr. Abiera Dep. Tr. 21:15-22:1) (emphasis added).

53.     Dr. Abiera also testified he did not know whether the clinic had any policies pertaining to the collection of copayments:

Q.     Does Kissimmee Wellness have a co-pay policy that you're aware of?
A.     That you'd have to ask the biller.· **That I don't know.**

*Id.* at 70:14-17 (emphasis added).

54.     Dr. Abiera's failure to fulfill his statutory duties enabled Colonial Medical Center to engage in a general business practice of billing amounts as its usual and customary charge while waiving or failing to collect copayments and deductibles in violation of the Insurance Fraud Statute. *See* Fla. Stat. § 817.234(7)(a).

55.     Colonial Medical Center did not make a good faith attempt to collect copayments and deductibles from its patients based on the fact it did not: (a) disclose the cost of its treatment; (b) present patients with bills for their treatment; (c) inform patients they were responsible for a 20% copayment; or (d) collect or attempt to collect copayments and deductibles from its patients. For example:

        a.     Patient D.J. (Claim No. 593397B50) testified:

Q.     Was there any discussion about a 20 percent copay with anyone at Kissimmee Medical and Wellness?
A.     No.
Q.     Do you know if they accepted your health insurance?
A.     I don't know.
Q.     Was there any discussion with the pricing and how much each of the modalities cost?
A.     No?
Q.     Was there any discussion about how you would pay?
A.     No.
Q.     And what was your expectation with the clinic about how you would pay?
A.     Honestly, we never got into that. There was no question about it.

**Exhibit 5** (Oct. 24, 2018 D.J. EUO Tr. 54:12-55:2).

        b.     Patient A.D.V.P. (Claim No. 596869N05) testified:

Q.     Okay. Now, have you received any bills from Kissimmee Medical?
A.     No.
Q.     Did you have discussions with Kissimmee Medical about how much the treatment would cost?
A.     I asked them because they take cases with lawyers, and when I first started going, I had the Dan Newlin office.
Q.     Okay.
A.     But once I was no longer represented, I did ask them how much is this going to be? But they just stated that it would go through my State Farm insurance first, but that I would not receive a bill from them.
Q.     Okay.
A.     Because the doctor did say the treatment from start to end would not be -- it would not be more than the $10,000.

**Exhibit 6** (Feb. 4, 2019 A.D.V.P. EUO Tr. 55:3-19).

        c.      Patient K.F. (Claim No. 596704M62) testified:

Q.      [D]id you have any discussions with anyone as Kissimmee Medical about how much the treatment was going to cost?
A.      No.
Q.      Any discussions about whether or not you had a co-pay with anyone at Kissimmee Medical?
A.      No, they said nothing.
Q.      Okay. And did you ask about any payment arrangements?
A.      I asked how this is going to work.
Q.      And what did they say?
A.      They said not to worry. That your auto insurance takes care of everything.

**Exhibit 7** (Mar. 8, 2019 K.F. EUO Tr. 42:11-42:23).

56.     Defendants' failure to collect (or make a good faith attempt to collect) copayments and deductibles renders each and every CMS-1500 bill sent or provided to State Farm Mutual and State Farm Fire false, misleading, incomplete, deceptive, fraudulent, and unlawful.

57.     Dr. Abiera also failed to systematically review Colonial Medical Center's billings as required by Florida Statutes § 400.9935(1)(g). Although Dr. Abiera purportedly reviewed 10 bills per month, Dr. Abiera's review was superficial and did not constitute a systematic review under the HCCA. In fact, Dr. Abiera admitted to spending only "a few minutes" (no more than five or ten minutes per month) reviewing the 10 patient files. **Exhibit 4** (Sept. 13, 2018 Dr. Abiera Dep. Tr. 19:22-20:5).

58.     The only portion of the file Dr. Abiera reviewed to ensure lawfulness of the clinics' billings was the bill itself. More specifically, Dr. Abiera's review of the clinic's billings entailed merely a review of the amounts charged for CPT codes identified on the bills:

Q.    And when you review these records, what are you reviewing?
A.    Basically the billing, whether it's appropriate.
Q.    What does that mean?
A.    You know, for like an EMS, how much they charge.
Q.    Oh, you're looking at the amount they're charging for the services?
A.    Yes, yes.· And --
Q.    And what else?
A.    That's basically it.

*Id*. at 11:18-12:4.

59.    Dr. Abiera was not provided and therefore did not review medical or treatment records along with the bills to ensure treatment was properly recorded or reflected on the ten bills he reviewed per month.

60.    Dr. Abiera admitted his lack of knowledge of the clinic's billings and lack of documentation provided made it "impossible" for him to perform systematic reviews of the ten bills per month that he was provided.

61.    Moreover, Dr. Abiera did not utilize any "system" for selecting the records he reviewed.  Rather, Colonial Medical Center's purported office managers pre-selected the patient files for his review.  *Id*. at 10:14-11:17.

62.    Dr. Abiera failed to take any corrective action to prevent Colonial Medical Center from submitting unlawful and fraudulent insurance claims to State Farm Mutual and State Farm Fire despite the fact Dr. Abiera knew, or at a minimum should have been aware, the treatment provided to patients at Colonial Medical Center, including the initial chiropractic examinations, initial medical examinations (which were performed by Dr. Abiera), the MRI orders, and the resulting rehabilitation services, were medically unnecessary and unlawfully rendered.

63.     Colonial Medical Center and Dr. Abiera knew or should have known Dr. Abiera did not comply with the requirements for medical directors in Florida under the HCCA.

64.     As a result of Colonial Medical Center's and Dr. Abiera's failure to satisfy their duties under the HCCA, they failed to detect (or willfully ignored) the pervasive patterns in the initial chiropractic and medical examination findings, MRI orders, and rehabilitative services discussed below.

**B.      Colonial Medical Center's Fraudulent Predetermined Treatment Plan**

65.     When patients presented to Colonial Medical Center, they were not legitimately examined, diagnosed, or treated for their unique needs. They were instead subjected to the Predetermined Treatment Plan in which chiropractors and Dr. Abiera purported to examine the patients, document they suffered from EMCs, and diagnose them with non-specific, soft-tissue injuries in multiple regions of the spine to support a predetermined course of care, which the patients received until they unilaterally stopped treatment or their No-Fault Benefits were exhausted or substantially reduced, at which time Dr. Abiera discharged the patients with a permanent impairment.

66.     The bills and supporting documentation associated with the purported initial chiropractic and medical examinations, the EMC findings, the treatment, diagnostic imaging, final medical examinations, and other services purportedly rendered to patients, which Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire are false, misleading, incomplete, deceptive, fraudulent, and unlawful because they misrepresented the services were medically necessary and lawfully rendered, when they were not. *See* Fla. Stat. § 627.736(5)(b)(1)(b)-(c).

### i.    The Fraudulent Initial Chiropractic Examinations

67.    The first aspect of the Predetermined Treatment was an initial examination performed by a chiropractor. Based on the purported examinations, reports were created summarizing patients' subjective complaints and the chiropractors' purported findings ("Initial Exam Reports"). Colonial Medical Center submitted, or caused to be submitted, the Initial Exam Reports to State Farm Mutual and State Farm Fire to support the office visit charges and to justify the predetermined treatment provided to patients pursuant to the Predetermined Treatment Plan.

68.    Colonial Medical Center's chiropractors performed initial examinations on patients ranging in age from 7 to 89 years old.  These patients sought treatment to address injuries purportedly sustained from various types of automobile accidents, including rear-end collisions, front impact collisions, side swipes, and side impact collisions, each with its own unique characteristics and impact on the human body.  Approximately 58% of patients sought emergency medical treatment at or around the time of the accidents, while 42% of patients never sought emergency medical care.

69.    The Initial Exam Reports prepared by Colonial Medical Center's chiropractors and submitted to State Farm Mutual and State Farm Fire are not credible. Despite the diverse nature and severity of these automobile accidents, the Initial Exam Reports reflect nearly identical complaints, findings, and diagnoses. Specifically, the overwhelming majority of Initial Exam Reports reflect: (1) patient complaints of pain in both the neck and back; (2) decreased range of motion in both the neck and back; and (3) diagnoses of non-specific soft

tissue injuries, including pain, sprains, and strains, in at least two, and most often three, regions of the spine. *See* **Exhibit 8.**

70.    The Initial Exam Reports do not reflect legitimate examinations, but instead reflect predetermined findings Defendants used to justify the decision to subject patients to the Predetermined Treatment Plan designed to exploit patients' No-Fault Benefits and was not tailored to address any patient's unique medical needs.

71.    Florida Administrative Code Rule 64B2-17.0065(4) mandates that all patient records include a treatment plan.  Contrary to this requirement, the Initial Exam Reports were entirely devoid of a treatment plan and failed to specify the frequency of treatment, the duration of treatment, the treatments to be performed with patients, and the timing of patients' follow-up chiropractic examinations.[3] Dr. Abiera, as the medical director, had a legal responsibility to review the medical records, detect the complete lack of a treatment plan, and take immediate corrective action—none of which he did.

72.    The treatment plan is an essential (and required) element of patients' treatment records.  At its core, the treatment plan is the distillation of the information gathered in connection with the initial examination. The treatment plan serves as a roadmap for the treatment of each patient's unique circumstances and informs the treating health care professionals of the appropriate course of care for each patient at each visit.

---

[3] The only record that purported to document patients' treatment plans was Colonial Medical Center's daily treatment note.  However, the purported treatment plan contained within the daily treatment note does not satisfy the requirements of Florida Administrative Code Rule 64B2-17.0065 as it only purported to document the frequency and duration of treatment and was frequently left blank. *See* **Exhibit 8**. Absent from the daily treatment note were the specific procedures each patient was to receive at Colonial Medical Center.

73.    A documented treatment plan was not needed at Colonial Medical Center because it was predetermined that all patients would receive the same treatment, irrespective of each patients' individualized needs and condition.

### ii.    The Fraudulent Initial Medical Examinations

74.    After the initial chiropractic examinations at Colonial Medical Center, patients met with Dr. Abiera for an initial medical examination.  Dr. Abiera documented his examinations in an initial examination report (the "Initial <u>Medical</u> Exam Report"), which Colonial Medical Center submitted to State Farm Mutual and State Farm Fire to induce payment.

75.    Dr. Abiera's examinations served no medically necessary purpose, were largely duplicative of the initial chiropractic examinations, and were performed to facilitate the predetermined treatment scheme by documenting a purported EMC which enabled Colonial Medical Center to unlock up to $10,000 in No-Fault Benefits instead of the $2,500 available for non-emergent medical conditions.  The results of Dr. Abiera's examinations were predetermined before he ever examined the patients and required virtually no medical decision making on Dr. Abiera's behalf.

76.    Dr. Abiera's examinations were not designed to legitimately assess and diagnosis patients, but rather were performed to maximize the collection of available insurance benefits, thereby enriching both the Defendants as well as patients' personal injury attorneys. Patient M.A. (Claim No. 597296P78) testified:

Q.    Okay. Do you understand why you saw the medical doctor?
A.    Yes. He's the doctor that does the paperwork, he says, for the lawyers and stuff like that.
Q.    Okay. And who told you that?

A.    He did.

**Exhibit 9** (Mar. 7, 2019 M.A. EUO Tr. 47:11-16). In this regard, each and every Initial <u>Medical</u>

Exam Report was false, misleading, incomplete, deceptive, fraudulent, and unlawful.

77.    To this end, Dr. Abiera provided patients with EMC determinations in

connection with his initial examinations, which the chiropractors who worked at Colonial

Medical Center could not provide. *See* Fla. Stat. § 627.736(1)(a)(3).

78.    The No-Fault Law narrowly defines EMCs as:

[A] medical condition manifesting itself by acute symptoms of sufficient
severity, which may include severe pain, such that the absence of immediate
medical attention could reasonably be expected to result in any of the following:
(a) Serious jeopardy to patient health.
(b) Serious impairment to bodily functions.
(c) Serious dysfunction of any bodily organ or part.

Fla. Stat. § 627.732(16).

79.    Dr. Abiera's EMC determinations are a central component of the Predetermined

Treatment Plan because it eliminated the $2,500 cap on PIP Benefits.  Once Dr. Abiera

determined a patient had an EMC, Colonial Medical Center could seek reimbursement for

services up to $10,000.  Fla. Stat. § 627.736(1)(a)(3).

80.    Dr. Abiera testified he provides an EMC determination to every patient that he

examines:

Q.    [F]or the emergency medical condition, what is required of you? What
      does Kissimmee Medical require of you when performing the
      emergency medical condition?
A.    For me to just state or define that what an emergency medical
      condition is on this patient, and that's what I noted.
Q.    Is this just a formality that you have to --
A.    Well, it's a requirement by the statutes **to get paid by the insurance
      company**.

> **Q.**    **Okay. Does every patient have a finding of emergency medical condition that you see at Kissimmee Medical?**
> **A.**    **Yes.**
> **Q.**    **And does every patient that you see at Colonial medical also have an emergency medical condition?**
> **A.**    **Yes.**
> Q.    And do you perform emergency medical condition findings at your facilities?
> A.    Yes.
> Q.    Does every patient that you see at your facilities also have an emergency medical condition?
> A.    Yes.
> Q.    So every patient that comes to Kissimmee Medical that you perform an evaluation and management on, you determine that that patient also has an emergency medical condition?
> A.    Yes.

**Exhibit 4** (Sept. 13, 2018 Dr. Abiera Dep. Tr. 34:20-35:21) (emphasis added).

81.    Contrary to the requirements of Florida Statutes § 627.732(16), Dr. Abiera has testified that any patient with subjective complaints of pain qualifies for an EMC:

> Q.    So in the patients that you see, what would cause you to not find that a patient has an emergency medical condition?
> A.    Well, if they don't have any pain.

**Exhibit 4** (Sept. 13, 2018 Dr. Abiera Dep. Tr. 44:6-9).

82.    The fact Dr. Abiera determined the vast majority of patients had an EMC is not credible and wholly inconsistent with the chiropractors' diagnosis of non-specific, relatively minor, soft tissue injuries, including neck and back pain, strains, and sprains, conditions which would rarely, if ever, qualify as an EMCs as defined by the statute. For example:

> a.    Patient S.S. (Claim No. 5904551L5) was purportedly involved in an automobile accident on December 9, 2016. The patient did not seek any emergency medical treatment and waited 12 days before appearing at Colonial Medical Center on December 21, 2016. The patient purportedly reported pain in the cervical, thoracic, and lumbar spine on the first visit. Pain in the cervical and thoracic regions was reported as four on a scale of ten, and pain in the lumbar region was reported as six

on a scale of ten. Dr. Abiera examined the patient on December 28, 2016 and diagnosed the patient with soft tissue injuries in these three regions—acute neck, upper back, and low back pain as wells as strains in the cervical, thoracic, and lumbar spine. Dr. Abiera determined the patient had an EMC the same day, despite his diagnosis of only non-specific soft tissue injuries.

b.    Patient V.V. (Claim No. 599G50009) was purportedly involved in an automobile accident on October 6, 2016. The patient did not seek any emergency medical treatment and waited 8 days before appearing at Colonial Medical Center on October 14, 2016. The patient purportedly reported pain in the cervical, thoracic, and lumbar spine on the first visit. Pain was reported as five on a scale of ten. Dr. Abiera examined the patient on October 26, 2016 and diagnosed the patient with soft tissue injuries in two spinal regions—acute cervical and lumbar strain. Dr. Abiera determined the patient had an EMC the same day, despite his diagnosis of only non-specific soft tissue injuries.

c.    Patient J.Y.C. (Claim No. 59924N349) was purportedly involved in an automobile accident on July 17, 2016. The patient did not seek any emergency medical treatment and waited 4 days before appearing at Colonial Medical Center on July 21, 2016. The patient purportedly reported pain in the cervical and lumbar spine on the first visit. Pain was reported as one to two on a scale of ten. Dr. Abiera examined the patient on August 3, 2016 and diagnosed the patient with soft tissue injuries in one spinal region—acute lumbar strain. Dr. Abiera determined the patient had an EMC the same day, despite his diagnosis of only a non-specific soft tissue injury.

83.    In addition to the false, misleading, deceptive, and fraudulent EMC determinations, the Initial Medical Exam Reports prepared by Dr. Abiera contain other findings that are largely boilerplate and not credible. For example, the overwhelming majority of Initial Medical Exam Reports reflect decreased range of motion and tenderness to palpation with spasms and trigger points to both the neck and back. *See* **Exhibit 8**. Dr. Abiera also provided patients with the same template assessment and prognosis for almost every patient. *Id*. As set forth below, Dr. Abiera almost always concluded patients' injuries were directly related to the automobile accidents and patients' prognoses were indeterminate:

> **ASSESSMENT:** After evaluating this history of the accident and physical examination, it is my medical opinion that the injuries sustained by this patient are directly related to the MVC on [date of accident].

> **PROGNOSIS:** This will depend on patient's response to treatment and other diagnostic tests.

84.     Dr. Abiera's examinations culminated in a treatment recommendation, which effectively served as a rubber stamp for the Predetermined Treatment Plan. Indeed, Dr. Abiera almost always recommended patients continue with their physical therapy modalities, follow-up with their chiropractor, and follow-up with Dr. Abiera in two weeks. *Id.* Dr. Abiera's treatment recommendation also included the same templated short and long term goals for almost all patients:

> Short term goals are to reduce pain, inflammation and muscle spasms. These may be attained by physical therapy modalities and chiropractic treatments.

> Long term goals are to restore range of motion, increase strength and to return to maximum functional capacity as much as possible to pre-injury status.

*Id*.

85.     In addition, patients have expressly refuted the veracity of the information reflected in the Initial Medical Exam Reports, underscoring that Dr. Abiera did not perform legitimate examinations. For example, Patient R.R. (Claim No. 5901S265K) was purportedly examined by Dr. Abiera on March 6, 2019. *See* **Exhibit 10**. The Initial Medical Exam Report, which was submitted to State Farm Mutual in support of a bill for the purported examination, reflects that Dr. Abiera conducted a physical examination, including palpating the neck and back, performed a straight leg raise test, and conducted a neurological examination to measure the strength in the hands, arms, and legs. *See id*. In sharp contrast to the Initial Medical Exam Report, patient R.R. provided testimony the examination lasted only five minutes, Dr. Abiera

did not physically touch her during the course of the examination, did not perform a straight leg raise test, and did not push or pull on her hands to measure her strength. **Exhibit 11** (May 29, 2019 R.R. EUO Tr. 46:14-23, 48:10-23).

86.    Similarly, Patient E.P. (Claim No. 592536F76) was purportedly examined by Dr. Abiera on January 10, 2018. *See* **Exhibit 12**. Contrary to the Initial Medical Exam Report issued by Dr. Abiera that reflects he palpated his neck and back and measured his range of motion, Patient E.P. testified Dr. Abiera did not perform a physical examination and that the encounter was limited to questions from Dr. Abiera. **Exhibit 13** (May 8, 2018 E.P. EUO Tr. 32:22-24). Patient E.P. stated Dr. Abiera asked him the following questions: "How I was doing. How the therapy was to me? If I was satisfied with it, you know, stuff like that." *Id*. at 32:25-33:3.

87.    In sum, the Initial Medical Exam Reports prepared by Dr. Abiera do not reflect legitimate examinations, but instead reflect perfunctory examinations (to the extent they were conducted at all) Defendants used to justify the Predetermined Treatment Plan and to increase the amount of benefits available under the patients' No-Fault Benefits and was not tailored to address any patient's unique medical needs. In this regard, each and every one of the Initial Medical Exam Reports (and their associated medical bills) is unreliable false, misleading, incomplete, deceptive, fraudulent, and unlawful.

### iii.    The Fraudulent MRIs Ordered by Colonial Medical Center

88.    The next aspect of the Predetermined Treatment Plan was the ordering of medically unnecessary MRIs.

89.    MRIs are advanced diagnostic imaging procedures that should only be ordered if they are necessary for a diagnostic purpose or to guide treatment or for another specific purpose designed to benefit the patient as explained in the medical record.  For example, MRIs may be appropriate when a patient's response to treatment is atypical or the provider has legitimate concerns about whether structural issues exist.  MRIs are almost never indicated in multiple regions of the spine and body simultaneously.  In addition, MRIs are rarely indicated for patients with soft tissue injuries.  When MRIs are clinically indicated and ordered, medical providers should evaluate and document whether any abnormalities have clinical significance for the patient's current condition and care plan.

90.    Pursuant to the Predetermined Treatment Plan, Colonial Medical Center ordered medically unnecessary MRIs that were not used for any actual diagnostic or treatment purpose documented in the medical record.  **Exhibits 14 and 15**. In total, seventy-eight percent (78%) of patients (550 of 703) received an MRI that was ordered by Colonial Medical Center, and ninety-seven percent (97%) of the patients (531 of 550) received an MRI of at least one spinal region. *See id.*

91.    The lack of medical necessity for the MRIs ordered by Colonial Medical Center is underscored by the timing of the MRI orders and the patients' diagnosis.  Colonial Medical Center ordered MRIs at the outset of treatment, which is rarely appropriate in an outpatient clinic setting for automobile accident patients. For example:

    a.    Patient C.P. (Claim No. 59585K302) was purportedly involved in an automobile accident on January 9, 2015. The patient appeared for an initial chiropractic examination at Colonial Medical Center on January 22, 2015 with complaints of neck and right leg pain. According to the Initial Exam Report the patient did not have any radiating pain, any numbness or tingling, or any weakness in strength. The patient was

diagnosed with non-specific injuries, including pain, strains, and sprains, but not any neurological conditions such as radiculopathy. Nevertheless, the chiropractor ordered a cervical MRI on the first visit, which was subsequently performed on January 30, 2015. A chiropractor purportedly reviewed the MRI report on February 3, 2015, but did not use it to modify the patient's treatment plan. The plan section of the February 3, 2015 daily treatment note states "continue."

b.     Patient J.L. (Claim No. 5903143J9) was purportedly involved in an automobile accident on November 30, 2016. The patient appeared for an initial chiropractic examination at Colonial Medical Center on December 6, 2016 with complaints of left shoulder pain, back pain, and headaches. According to the Initial Exam the patient did not have any radiating pain, any numbness or tingling, or any weakness in strength. The patient was diagnosed with non-specific injuries, including pain and post traumatic headaches, but not any neurological conditions such as radiculopathy. Nevertheless, the chiropractor ordered a lumbar MRI on the first visit, which was subsequently performed on December 13, 2016. A chiropractor reviewed the MRI report on December 14, 2016, but did not use it to modify the patient's treatment plan. The plan section of the December 14, 2016 daily treatment note states "continue."

c.     Patient S.D. (Claim No. 5906865R7) was purportedly involved in an automobile accident on January 20, 2017. The patient appeared for an initial chiropractic examination at Colonial Medical Center on January 23, 2017 with complaints of neck and back pain. According to the Initial Exam Report the patient did not have radiating pain, any numbness or tingling, or any weakness in strength. The patient was diagnosed with non-specific injuries, including pain, but not any neurological conditions such as radiculopathy. Nevertheless, the chiropractor ordered a cervical MRI on the first visit, which was subsequently performed on January 26, 2017. A chiropractor reviewed the MRI report on January 30, 2017, but did not use it to modify the patient's treatment plan. The plan section of the January 30, 2017 daily treatment note states "continue."

d.     Patient C.F. (Claim No. 59956D265) was purportedly involved in an automobile accident on August 24, 2016. The patient appeared for an initial chiropractic examination at Colonial Medical Center on August 29, 2016 with complaints of neck pain, back pain, and headaches. According to the Initial Exam Report, the patient did not have radiating pain, any numbness or tingling, or any weakness in strength. The patient was diagnosed with non-specific injuries, including pain, strains, and headaches, but not any neurological conditions such as radiculopathy.

Nevertheless, the chiropractor ordered a lumbar MRI on the first visit, which was subsequently performed on September 9, 2016. A chiropractor reviewed the MRI report on September 13, 2016, but did not use it to modify the patient's treatment plan. The plan section of the September 13, 2016 daily treatment note states "continue."

92.    The MRI findings did not impact the treatment plans.  Indeed, the chiropractors and/or Dr. Abiera almost always repeated the MRI results into their subsequent examination reports without analyzing the results or explaining whether they impacted the patient's diagnosis or treatment in any way.  As a result, the Predetermined Treatment Plan before and after the MRIs simply remained the same. In this regard, each MRI and the associated billings for the MRIs were false, misleading, deceptive, and fraudulent because they induced State Farm Mutual and State Farm Fire into paying for medically unnecessary MRI services.

### iv.    The Fraudulent Rehabilitation Treatment at Colonial Medical Center

93.    Patients typically began rehabilitation on the first or second visit at Colonial Medical Center.  Although it is well-established stretching, strengthening, and physical exercise are the primary forms of rehabilitation for soft tissue injuries of the neck and back, the Predetermined Treatment Plan relied heavily on passive modalities, which allowed Colonial Medical Center to maximize profits by submitting charges for multiple modalities on each visit with minimal direct one-on-one time between the patient and any practitioner.

94.    Pursuant to the Predetermined Treatment Plan, almost every patient received the same six services from Colonial Medical Center, which included five passive modalities (purportedly hot and/or cold packs, electrical stimulation, manual therapy, chiropractic

manipulations, and ultrasound) and one active therapy (purportedly therapeutic exercise). **Exhibit 14**.

95.    On each visit, Colonial Medical Center almost always purported to perform four to five passive modalities, regardless of the patients' need for these services or the patients' response to treatment.  **Exhibit 14**.  Colonial Medical Center provided the foregoing modalities pursuant to the Predetermined Treatment Plan to increase the charges it could submit to and collect from State Farm Mutual and State Farm Fire.  Indeed, while any one of these modalities may be medically necessary for a particular patient on a particular day, this combination of modalities is seldom, if ever, medically necessary for most patients on most treatment days.

96.    The treatment patients purportedly received at Colonial Medical Center was not individualized or adjusted over the course of treatment to address patients' unique response to treatment, progress, or lack thereof. Rather, patients were inappropriately subjected to a one size fits all plan of rehabilitation, which continued until patients either self-discharged or their No-Fault Benefits were exhausted or substantially reduced.

97.    In fact, patients have testified under oath treatment was not tailored to their unique needs and circumstances. For example:

    a.    Patient R.M. (Claim No. 595845D89) testified: "I felt like cattle drive. Everybody did the same thing, and I didn't feel like it was being effective for myself and my injuries." **Exhibit 16** (Feb. 11, 2019 R.M. EUO Tr. 38:4-6).

    b.    Patient J.T. (Claim No. 596479Q44) testified treatment was provided pursuant to a "standard regimen," which he noticed on his own. **Exhibit 17** (Jan. 23, 2019 J.T. EUO Tr. 42:2-7).

98.    Moreover, Colonial Medical Center's use of passive modalities was untethered to the goal of increasing physical activity and facilitating the performance of therapeutic

exercise, which is harmful because it can lead to patient inactivity, prolonged recovery, and increased costs. Colonial Medical Center used the same four to five passive modalities on almost every visit and did not decrease the use of these passive modalities as patients progressed into exercise.

99.     In addition, as discussed below, three of the six services included in the Predetermined Treatment Plan— therapeutic exercise (CPT code 97110), ultrasound (CPT 97035), and manual therapy (CPT 97140)—were not legitimately performed.

### a. The Service Billed as Therapeutic Exercise Was Not Legitimately Performed

100.     Therapeutic exercise was the only active modality purportedly provided by Colonial Medical Center. According to the *CPT Manual*, therapeutic exercise is a skilled therapeutic procedure administered by a "physician or other qualified health care professional." Therapeutic exercise is billed in 15 minute units and requires "direct one-on-one patient contact." The American Chiropractic Association ("ACA")—the nation's largest association of chiropractors—has expressly endorsed the AMA's position on direct one-on-one contact. The ACA's "Coding Policy" for "Timed Codes: Constant Attendance Modalities and Therapeutic Procedures" provides:

> From a CPT coding perspective, code 97110 [therapeutic exercises] requires the practitioner to maintain direct contact (i.e., visual, verbal, and/or manual contact) during provision of the service, so 97110 should only be reported when the practitioner is providing therapy to one patient alone[.]

101.     Contrary to the misrepresentations contained in Colonial Medical Center's bills and treatment records, the service billed as therapeutic exercise only constituted non-compensable, general exercise for two reasons. First, Colonial Medical Center failed to

maintain direct one-on-one contact with each patient. Instead, exercise was performed in a

group setting. For example:

     a.     Patient M.A. (Claim No. 597296P78) testified:

Q.     When you're doing the stretching, is there one of the staff members that's continually monitoring you?

**A.     She sits in the middle and monitors everyone. It's not, like, one on one.**

Q.     How did you know what stretches to do?

A.     They told me.

**Exhibit 9** (Mar. 7, 2019 M.A. EUO Tr. 27:17-22) (emphasis added).

     b.     Patient R.M. (Claim No. 595637C43) testified:

Q.     Has there ever been a time when you're performing those exercises and it's just you and one person from the clinic, an employee of the clinic that's supervising or assisting you?

A.     No, there's usually, every time I'm in there, at least three people.

         …

**Q.     Okay. Has it ever been one-to-one, one employee from the clinic and one patient that you've seen?**

**A.     No, not with me, not when I come. See, I come late in the evening and that's when a lot of other people come in. So no, I have never seen it that low.**

Q.     Okay. And you've never seen it where it's you and one other patient and then two clinic employees or instructors?

A.     No, it's usually -- every time I've been there, there's at least been three or four of us.

Q.     Patients?

A.     Patients.

Q.     Okay

**A.     It's that packed in there.**

**Exhibit 18** (Nov. 27, 2018 R.M. EUO Tr. 44:1-6; 44:24-45:13) (emphasis added).

     c.     Patient B.M. (Claim No. 590536X25) testified:

Q.     Going back to your treatment at Kissimmee Medical, the exercise portion, when you would perform the stretching and using the band, was there anyone else in the room with you?

A.     Yeah.

Q.    Okay.

**A.    There was always like I guess a medical assistant you would call her, always one sitting there watching or doing paperwork and stuff.**

…

A.    It wouldn't just be just yourself. Sometimes it could be me and three other people. But they wouldn't allow more than like four people in there because it was a small space.

Q.    Okay. Were you ever in there with just you and the medical assistant performing the exercises?

A.    Yes.

Q.    Okay. Do you know approximately how many times that would have been?

A.    I would only say maybe like three or four times.

Q.    Okay.

**A.    Because they were very busy, so they always had people in there.**

**Exhibit 19** (June 28, 2018 B.M. EUO Tr. 41:19-42:21) (emphasis added).

102.    Second, the service billed as therapeutic exercise was not administered by a "physician or other qualified health care professional," but rather by RCAs and CCPAs. RCAs and CCPAs are not physicians or "other qualified health care professionals," but rather, at best, qualify as "clinical staff" because they are required to work under the supervision of a chiropractic physician. *See* Fla. Stat. §§ 460.4166(1)-(2) and 460.4165(2). Consequently, the RCAs and CCPAs who worked for Colonial Medical Center were precluded from administering therapeutic exercise. To conceal the scheme, Colonial Medical Center had various chiropractors, including but not limited to Richard W. Robitaille, D.C., Cristina Sajgo, D.C., Rafael Rosado, D.C., and Anthony Cafiero  sign the CMS-1500 forms representing to State Farm Mutual and State Farm Fire the therapeutic exercises were performed by properly licensed medical professionals (i.e., chiropractors). Nothing in the medical records indicated the services were performed by unqualified clinic staff. Insofar as only RCAs and CCPAs performed the therapeutic exercises at Colonial Medical Center, every medical record and bill

Colonial Medical Center submitted to State Farm Mutual and State Farm Fire was false, misleading, incomplete, deceptive, fraudulent, and unlawful because it represented the treatment was being performed by a properly qualified medical professional, when it was not.

### b. The Service Billed as Ultrasound Was Not Legitimately Performed

103.    According to the *CPT Manual*, ultrasound is a "constant attendance" modality that requires "direct (one-on-one) patient contact" and is billed in 15 minute increments.

104.    Colonial Medical Center did not legitimately perform the service billed as ultrasound because its clinical staff failed to maintain direct one-on-one contact with patients throughout the course of ultrasound.

105.    Colonial Medical Center performed ultrasound by affixing a device to the patient's body, which purportedly emitted ultrasound energy.  The service was provided concurrently with two unattended services—electrical stimulation and hot and/or cold packs. After the ultrasound device, electrical stimulation electrodes, and hot and/or cold packs were affixed to the patient, the clinical staff did not maintain direct contact with the patient. Consequently, Colonial Medical Center is not entitled to compensation for ultrasound.

106.    To conceal the scheme, Colonial Medical Center had various chiropractors, including but not limited to, Richard W. Robitaille, D.C., Cristina Sajgo, D.C., Rafael Rosado, D.C., and Anthony Cafiero sign the CMS-1500 forms representing to State Farm Mutual and State Farm Fire the ultrasound services were performed by properly licensed medical professionals (i.e., chiropractors). Nothing in the medical records indicated the services were performed by unqualified clinic staff. Insofar as the ultrasound therapy was not properly performed, every medical record and bill Colonial Medical Center submitted to State Farm

Mutual and State Farm Fire was false, misleading, deceptive, fraudulent, and unlawful because the bills and records represented the treatment was being properly performed, when it was not.

### c. The Service Billed as Manual Therapy Was Not Legitimately Performed and Constituted Non-Compensable Massage

107.    In 2012, the Florida Legislature amended the No-Fault Law to remove massage from the list of compensable post-motor vehicle accident medical services. Unable to bill for massage, unscrupulous medical providers often perform massage, but bill for "manual therapy"—which *is* compensable under PIP.

108.    The service Colonial Medical Center billed as manual therapy was not legitimately performed by qualified health care professionals and constituted non-compensable massage.

109.    According to the *CPT Manual*, manual therapy requires the "application of clinical skills" as well as "direct (one-on-one)" patient contact from a "physician or other qualified health care professional." The service includes various manual therapy techniques including mobilization/manipulation, manual lymphatic drainage, and manual traction. As the name suggests, the service requires providers utilize their hands in order to provide these techniques. *See CPT Assistant*, Medicine: Physical Medicine & Rehabilitation, 97140 (Q&A) (May 2009) ("As the code descriptor states, 'manual' therapy requires that providers utilize their hands in order to provide these techniques.")

110.    The service billed as manual therapy was not administered by a "physician or other qualified health care professional," but rather by RCAs and CCPAs. As stated above, RCAs and CCPAs only qualify as "clinical staff" because they are required to work under the supervision of a chiropractic physician. *See* Fla. Stat. §§ 460.4166(1)-(2) and 460.4165(2).

Consequently, the RCAs and CCPAs who worked for Colonial Medical Center were precluded from administering manual therapy.

111.    In addition, the service billed as manual therapy actually constituted massage, which is non-compensable under the No-Fault Law. As amended in 2012, the No-Fault Law provides in relevant part: "[m]edical benefits do not include massage as defined in s. 480.033 …, regardless of the person, entity, or licensee providing massage[.]" Fla. Stat. § 627.736(1)(a)(5). Section 480.033 of the Massage Practice Act defines massage as:

> "Massage" means the manipulation of the soft tissues of the human body with the hand, foot, arm, or elbow, whether or not such manipulation is aided by hydrotherapy, including colonic irrigation, or thermal therapy; any electrical or mechanical device; or the application to the human body of a chemical or herbal preparation.

Fla. Stat. § 480.033(3).

112.    Patients have testified they received "massage" performed with the use of a gel, cream, or lubricant. For example:

a.    Patient L.S. (Claim No. 596351T48) testified she received a service referred to by the clinic as "massage therapy" administered with the use of a cream or gel. **Exhibit 20** (Jan. 30, 2019 L.S. EUO Tr. 23:19-21; 24:10-12).

b.    Patient M.B. (Claim No. 595827T85) testified he received massage administered with the use of a lotion. **Exhibit 21** (Jan. 23, 2019 M.B. EUO Tr. 24:3-8).

113.    The manipulation of the soft tissues of the human body with hand, foot, arm, or elbow that includes the application of a chemical, such as the gels, creams, and lubricants, clearly constitutes massage as set forth in Florida Statutes § 480.033(3).

114.    Patients have testified massage was performed in certain instances with a mechanical device. For example:

     c.     Patient M.G. (Claim No. 597579V76) testified massage was performed manually by hand and/or with a machine she described as "a ball with a handle." **Exhibit 22** (April 24, 2019 M.G. EUO Tr. 27:20-28:10).

115.    Although massage may be administered with a mechanical device, manual therapy is required to be performed by hand. *Compare* Fla. Stat. § 480.033(3) *with CPT Assistant*, Medicine: Physical Medicine & Rehabilitation, 97140 (Q&A)(May 2009) ("As the code descriptor states, 'manual' therapy requires that providers utilize their hands in order to provide these techniques.").

116.    Colonial Medical Center's improper rendering of and billing for "manual therapy" when, in actuality, the RCAs and CCPAs were improperly providing non-covered massage services, renders each and every bill and record submitted the State Farm Mutual and State Farm Fire false, misleading, deceptive, fraudulent, and unlawful because the bills and records represented "manual therapy" was being properly performed, when it was not.

**v.    The Predetermined Treatment Plan Did Not Benefit the Patients**

117.    Pursuant to the Predetermined Treatment Plan, patients continued to receive services at Colonial Medical Center, whether they needed them or not, until the patients' No-Fault Benefits were exhausted or substantially reduced, or the patients unilaterally decided to stop treatment.

118.    At the end of the Predetermined Treatment Plan, Dr. Abiera purported to conduct final examinations for those patients who were discharged and released the patients from further treatment. These final examinations are reflected in reports that purport to detail the patients' final subjective complaints, examination findings, the results of any diagnostic tests, and diagnoses ("Final Exam Reports").

119.    Despite the extensive treatment patients purportedly received (and were billed for) at Colonial Medical Center, Dr. Abiera prepared Final Exam Reports reflecting patients uniformly: (1) did not return to their pre-accident state of health; and (2) sustained a permanent impairment as a result of the accident. *See* **Exhibit 14**.

120.    Patients were invariably discharged with some level of permanent impairment and recommendations for future, supportive chiropractic care. Colonial Medical Center's documentation, reflecting nearly all of the patients on **Exhibit 14** some form of permanent impairment, is not credible. Accordingly, each and every Final Exam Report is false, misleading, deceptive, fraudulent, and unlawful because it represented the patient's status and outcome was more severe than it actually was.

## VI.    STATE FARM MUTUAL AND STATE FARM FIRE'S RELIANCE

121.    Defendants are obligated legally and ethically to act honestly and with integrity. Florida practice statutes govern the conduct of physicians and chiropractors who provide services in the state of Florida. *See, e.g.*, Fla. Stat. §§ 456.072, 458.331, and 460.413 (collectively, the "Disciplinary Statutes"). Pursuant to the Disciplinary Statutes, the following acts can result in disciplinary action against a physician and chiropractor:

a.    Making misleading, deceptive, or fraudulent representations in or related to the practice of the licensee's profession;

b.    Making deceptive, untrue, or fraudulent representations in or related to the practice of a profession; and

c.    Exercising influence on the patient or client for the purpose of financial gain of the licensee or a third party.

Fla. Stat. §§ 456.072(1)(a), (m), and (n), 458.331(1)(k) and (n), and 460.413(1)(k) and (n).

122.    Moreover, the Insurance Fraud Statute imposes criminal penalties on providers who "with the intent to injure, defraud or deceive any insurer prepares or makes any written statement that is intended to be presented to any insurer in connection with, or support of, any claim for payment pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning the claim." Fla. Stat. § 817.234(1)(a)(2).

123.    In addition, Colonial Medical Center submitted each and every one of its medical bills on a CMS-1500 form. Dr. Abiera and/or another medical provider at Colonial Medical Center signed Box 31 of the form certifying the statements on the back of the form applied to each and every bill the provider submitted to State Farm Mutual and State Farm Fire. Specifically, the backside of the form states "Any person who knowingly files a statement of claim containing any misrepresentation of any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." When State Farm Mutual and State Farm Fire received the CMS-1500 forms with this signed certification, they interpreted the signatures as certifying the provider was being honest, truthful and complete.

124.    Despite their duty to act honestly, with integrity, and in accordance with Florida law, Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that were false, misleading, incomplete, deceptive, and fraudulent because they represented patients were legitimately examined, had sustained EMCs, and received medically necessary and lawfully rendered services when, in fact, they did not. Defendants submitted the bills and supporting documentation to State Farm Mutual

and State Farm Fire to induce them to pay benefits to which Defendants knew they were not entitled.

125.    As a result of Defendants' false statements in the bills and supporting medical records they submitted to State Farm Mutual and State Farm Fire, State Farm Mutual and State Farm Fire paid for medically unnecessary and unlawful services.

126.    State Farm Mutual and State Farm Fire are under statutory and contractual duties to pay or deny claims for No-Fault Benefits within 30 days, and may be ordered to pay interest and attorneys' fees if they fail to pay the full amount owed within that time period. *See* Fla. Stat. § 627.736(4)(b) and (d). Defendants' fraudulent scheme was successful because of precisely how State Farm Mutual and State Farm Fire are required to adjust claims for No-Fault Benefits.

127.    Defendants developed and implemented their fraudulent scheme to take advantage of State Farm Mutual and State Farm Fire and Florida's No-Fault claims environment. Defendants knew the efficient operation of a system of insurance requires prompt processing of individual claims. Thus, Defendants designed a scheme that could go undetected in an individual claim. Specifically, and as discussed above, Defendants fraudulently concealed their conduct by repeatedly submitting misleading and deceptive bills and supporting documentation that made it appear they were delivering medically necessary and lawful care when considered in the context of a single patient's claim, when they were not.

128.    Each bill and its supporting documentation, when viewed in isolation, did not reveal its fraudulent and unlawful nature. It was only when the bills and supporting documentation across all of the patients at issue in this Complaint were viewed together as a

whole, did the patterns emerge revealing the fraudulent and unlawful nature of all the bills and supporting documentation.  State Farm Mutual and State Farm Fire did not, and could not have reasonably, discovered their payments to Defendants were based upon fraud until they reviewed together as a whole the patterns reflected in the bills and supporting documentation for all of the patients at issue in this Complaint. *See*, *e.g.* **Exhibits 8, 14, 15 & 23**. Only then did it become apparent Defendants were not providing necessary and lawful medical care designed to address their patients' unique needs. The submission of fraudulent bills and supporting documentation were affirmative acts by Defendants that prevented State Farm Mutual and State Farm Fire from discovering the truth.

129.    The bills and supporting documents Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire in support of the fraudulent and unlawful charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual and State Farm Fire to rely on them to their detriment. As a result, State Farm Mutual and State Farm Fire have incurred damages of more than $3.89 million.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violations of the Florida Deceptive and Unfair Trade
Practices Act Against Colonial Medical Center and Dr. Abiera)**

130.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

131.    In each claim described in **Exhibit 1**, Colonial Medical Center and Dr. Abiera engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the FDUTPA. *See* Fla. Stat. §§ 501.201-501.213.

132.    These acts and practices include Colonial Medical Center's and Dr. Abiera's failure to comply with their statutory and administrative medical director duties, which rendered the services provided to State Farm Mutual and State Farm Fire insureds unlawful and noncompensable. *See* Fla. Stat. § 400.9935(3).

133.    These acts and practices include intentionally and knowingly making, and causing to be made, false, misleading, incomplete, deceptive, and fraudulent statements of material fact to State Farm Mutual, State Farm Fire, and AHCA, injuring State Farm Mutual and State Farm Fire insureds, the State of Florida, and the public as a whole.

134.    Specifically, Colonial Medical Center and Dr. Abiera deceived and defrauded State Farm Mutual and State Farm Fire by including, but not limited to: (a) providing false information to AHCA to obtain health care clinic licenses, including representations in the Health Care Clinic Licensing Applications that Dr. Abiera provided day-to-day supervision of Colonial Medical Center, upon which they intended for State Farm Mutual and State Farm Fire to rely in processing the bills and related documentation for payment; and (b) falsely representing Dr. Abiera complied with his duties under Florida law to conduct systematic reviews to ensure billings were not fraudulent or unlawful, failing to take immediate corrective action upon discovery of an unlawful charge, provide day-to-day supervision and oversight of Colonial Medical center, failing to ensure Colonial Medical Center was collecting (or making a good faith effort to collect) copayments and deductibles, and failing to properly ensure all

health care practitioners at Colonial Medical Center had active appropriate certification or licensure for the level of care provided.

135.    Florida Statutes § 626.9541 defines knowingly causing to be presented to any insurer "a false claim for payment" as an unfair method of competition and unfair or deceptive act or practice. Fla. Stat. § 626.9541(1)(u).

136.    Colonial Medical Center and Dr. Abiera knowingly presented or caused to be presented a false claim for payment each time they presented or caused to be presented charges for services or corresponding medical records that were for treatment that was not lawful when it was rendered.

137.    The Florida Insurance Fraud Statute provides in the relevant part:

(1)(a) A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer:

> 1. Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim;

> 2. Prepares or makes any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim;

Fla. Stat. § 817.234(1)(a)(1)-(2).

138.    Colonial Medical Center and Dr. Abiera violated the Insurance Fraud Statute (Florida Statutes § 817.234) by submitting, or causing to be submitted, bills and supporting

documentation that were fraudulent in that they represented the services were lawfully rendered when, in fact, the services were unlawful and noncompensable.

139.    Defendants' violations of the HCCA, Florida Statute § 626.9541, and Florida Statute § 817.234 are *per se* FDUTPA violations.

140.    In addition, Colonial Medical Center's and Dr. Abiera's above-described conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing the charges were lawful when they were rendered, when they were not.

141.    Further, Colonial Medical Center's and Dr. Abiera's above-described conduct was unfair.  The conduct was contrary to Florida public policy and was unconscionable, immoral, unethical, oppressive, and unscrupulous.  This conduct produced no benefits to consumers or competition.

142.    Colonial Medical Center and Dr. Abiera are jointly and severally liable for the false claims submitted to State Farm Mutual and State Farm Fire because they each played an intentional and essential role in furthering the unlawful scheme.

143.    As a result of these Defendants' deceptive and unfair practices State Farm Mutual and State Farm Fire were aggrieved and suffered actual damages in excess of $3.89 million.

144.    State Farm Mutual and State Farm Fire seek an award of attorney's fees pursuant to Florida Statutes § 501.2105(1).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court enter judgment in its favor and award compensatory damages, interest thereon, attorney's fees,

and costs against Colonial Medical Center and Dr. Abiera, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### SECOND CLAIM FOR RELIEF

**(Violations of the Florida Deceptive and Unfair Trade Practices Act Against Colonial Medical Center)**

145.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein the allegations in paragraphs 1 through 129 above.

146.    In each claim described in **Exhibit 1**, Defendant Colonial Medical Center engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the FDUTPA. *See* Fla. Stat. §§ 501.201-501.213.

147.    Colonial Medical Center's unfair and deceptive practices include engaging in a general business practice of waiving (or failing to make a good faith effort to collect) copayments and deductibles.

148.    The Florida Insurance Fraud Statute provides in the relevant part:

It shall constitute a material omission and insurance fraud, punishable as provided in subsection (11), for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge[.]

Fla. Stat. § 817.234(7)(a.

149.    Colonial Medical Center violated the Insurance Fraud Statute (Florida Statutes § 817.234) by, among other things, failing to make a good faith attempt to collect copayments and deductibles from State Farm Mutual and State Farm Fire insureds.

150.    These violations of Florida Statutes § 817.234 are *per se* FDUTPA violations.

151.    In addition, Colonial Medical Center's above-described conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing the charges were lawful when they were rendered.

152.    Further, Colonial Medical Center's above-described conduct was unfair.  The conduct was contrary to Florida public policy and was unconscionable, immoral, unethical, oppressive, and unscrupulous.  This conduct produced no benefits to consumers or competition.

153.    As a result of Colonial Medical Center's deceptive and unfair practices, State Farm Mutual and State Farm Fire were aggrieved and suffered actual damages in excess of $3.89 Million.

154.    State Farm Mutual and State Farm Fire seek an award of attorney's fees pursuant to Florida Statutes § 501.2105(1).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages, interest thereon, attorney's fees, and costs against Colonial Medical Center, and grant such other relief as the Court deems just and appropriate.

### THIRD CLAIM FOR RELIEF

### (Violations of the Florida Deceptive and Unfair Trade Practices Act Against Colonial Medical Center and Dr. Abiera)

155.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

156.    In each claim described in **Exhibit 1**, Colonial Medical Center and Dr. Abiera engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the FDUTPA. *See* Fla. Stat. §§ 501.201-501.213.

157.    Defendants' unfair and deceptive practices include representing that Colonial Medical Center's services were performed, medically necessary, and lawful as required by the No-Fault Law when, in fact, these services were not because they were provided pursuant to the Predetermined Treatment Plan. As a result of the Predetermined Treatment Plan, which rendered the Defendants' services unlawful and non-compensable, (a) patients were not legitimately examined to determine the true nature and extent of their injuries; (b) patients were not legitimately diagnosed; (c) patients were falsely determined to have sustained an EMC as a result of their auto accident; (d) patients received treatment that was not medically necessary, including five passive modalities and one active therapy; (e) patients received medically unnecessary MRIs; (f) patients were falsely assessed with permanent impairments at their final examinations; and; (g) copayments and deductibles were not collected from patients.

158.    The Florida Insurance Fraud Statute provides in the relevant part:

(1)(a) A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer:

> 1. Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim;

> 2. Prepares or makes any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that

such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim;

Fla. Stat. § 817.234(1)(a)(1)-(2).

159.     Colonial Medical Center and Dr. Abiera violated the Insurance Fraud Statute (Florida Statutes § 817.234) by, among other things, submitting, or causing to be submitted, bills and supporting documentation that were false, misleading, incomplete, deceptive, and fraudulent in that they represented the services were medically necessary, related to injuries from auto accidents, and lawfully rendered when, in fact, the services were provided pursuant to the Predetermined Treatment Plan or never provided.

160.     Florida Statutes § 626.9541 defines knowingly causing to be presented to any insurer "a false claim for payment" as an unfair method of competition and unfair or deceptive act or practice. Fla. Stat. § 626.9541(1)(u).

161.     Colonial Medical Center and Dr. Abiera knowingly presented or caused to be presented a false claim for payment each time they presented or caused to be presented charges for services or corresponding medical records that was for treatment that was not medically necessary when it was rendered.

162.     These violations of Florida Statutes § 817.234 and § 626.9541 are *per se* FDUTPA violations.

163.     In addition, Colonial Medical Center's and Dr. Abiera's above-described conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing the charges were provided and were medically necessary when they were rendered.

164.    Further, Colonial Medical Center's and Dr. Abiera's above-described conduct was unfair.  The conduct was contrary to Florida public policy and was unconscionable, immoral, unethical, oppressive, and unscrupulous.  This conduct produced no benefits to consumers or competition.

165.    As a result of Colonial Medical Center's and Dr. Abiera's deceptive and unfair practices State Farm Mutual and State Farm Fire were aggrieved and suffered actual damages in excess of $3.89 million.

166.    State Farm Mutual and State Farm Fire seek an award of attorney's fees pursuant to Florida Statutes § 501.2105(1).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages, interest thereon, attorney's fees, and costs against Colonial Medical Center and Dr. Abiera, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment Against Colonial Medical Center and Dr. Abiera)

167.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

168.    In each claim described in **Exhibit 1**, State Farm Mutual and State Farm Fire conferred a benefit upon Colonial Medical Center and Dr. Abiera by paying the claims and these Defendants voluntarily accepted and retained the benefit of those payments. Dr. Abiera received a benefit through payments made to him by Colonial Medical Center and profited off of receipt of the payment of Insureds' benefits.

169.    Because these Defendants knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire charges for services and corresponding medical records for treatment that was not lawful when it was rendered because Colonial Medical Center and Dr. Abiera failed to comply with their statutory and administrative medical director obligations, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

170.    As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and Colonial Medical Center and Dr. Abiera have been unjustly enriched by more than $3.89 million.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages, interest thereon, and costs against Colonial Medical Center and Dr. Abiera, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment Against Colonial Medical Center and Dr. Abiera)

171.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

172.    In each claim described in **Exhibit 1**, State Farm Mutual and State Farm Fire conferred a direct benefit upon Colonial Medical Center and Dr. Abiera by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments. Dr. Abiera received a benefit through payments made to him by Colonial Medical Center and profited off of receipt of the payment of Insureds' benefits.

173.    Because these Defendants knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire charges for services and corresponding medical records for treatment that was not medically necessary and lawfully rendered, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

174.    As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and Colonial Medical Center and Dr. Abiera have been unjustly enriched by more than $3.89 million.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages, interest thereon, and costs against Colonial Medical Center and Dr. Abiera, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### SIXTH CLAIM FOR RELIEF

### (Common Law Fraud Against Colonial Medical Center and Dr. Abiera)

175.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

176.    In the claims set forth in **Exhibit 1**, Colonial Medical Center and Dr. Abiera intentionally and knowingly made false, misleading, incomplete, deceptive, and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting, or causing to be submitted, thousands of bills and supporting documentation that contained false, misleading, incomplete, deceptive, and fraudulent representations of material fact related to the treatment of the insureds in order to induce payment from State Farm Mutual and State Farm Fire.

177.    Specifically, Defendants falsely, misleadingly, deceptively, and fraudulently represented Colonial Medical Center's services were performed, were medically necessary, and were lawful as required by the No-Fault Law and the medical director Statute when, in fact, these services were not medically necessary and/or lawful because they were provided pursuant to the Predetermined Treatment Plan. As a result of the Predetermined Treatment Plan, which rendered the Defendants' services unlawful and non-compensable, Defendants made representations of material fact that were false and fraudulent including (a) patients were not legitimately examined to determine the true nature and extent of their injuries; (b) patients were not legitimately diagnosed; (c) patients were falsely determined to have sustained an EMC as a result of their auto accident; (d) patients received treatment that was not medically necessary, including five passive modalities and one active therapy; (e) patients received medically unnecessary MRIs; (f) patients were falsely assessed with permanent impairments at their final examinations; and; (g) copayments and deductibles were not collected from patients.

178.    Colonial Medical Center and Dr. Abiera knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire were false, misleading, incomplete, deceptive, and fraudulent when they were made.

179.    Colonial Medical Center and Dr. Abiera made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

180.    As a result of its reliance on these misrepresentations, State Farm Mutual and State Farm Fire has incurred damages of at least $3.89 million.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages, interest thereon, and costs against Colonial Medical Center and Dr. Abiera, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### SEVENTH CLAIM FOR RELIEF

### (Declaratory Relief Pursuant to 28 U.S.C. § 2201 Against Colonial Medical Center)

181.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 129 above.

182.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

183.    There is an actual case and controversy between State Farm Mutual and State Farm Fire and Colonial Medical Center as to all claims and charges Colonial Medical Center has submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire for No-Fault Benefits that have not been paid or were allegedly underpaid, including, but not limited to, the claims set forth in **Exhibits 1 and 24**.  To the extent any such claims and charges are for services that were not performed, were not medically necessary and/or not lawfully rendered and are pending through the date of this Complaint and the trial of this case, State Farm Mutual and State Farm Fire contends no such claims and charges are owed for the reasons discussed above.

184.    Because Colonial Medical Center has submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that were false and contained fraudulent statements, and otherwise engaged in the above-described fraudulent and/or unlawful conduct, Colonial Medical Center is not entitled to reimbursement for any

claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.

185.    There is a bona fide, present, and practical need for a declaration as to all such claims and charges.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring Colonial Medical Center is not entitled to reimbursement for any of the unpaid or allegedly underpaid charges for services purportedly performed at Colonial Medical Center and submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case, including, but limited to, the claims set forth in **Exhibits 1 and 24**, and for supplementary relief, interest, and costs as this Court deems equitable, just, and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury of all issues so triable.

Dated: February 25, 2020.            By: */s/ Nicholas J. Purvis*
                                        David I. Spector, **Trial Counsel**
                                        Florida Bar Identification No. 086540
                                        Nicholas J. Purvis, **Trial Counsel**
                                        Florida Bar Identification No. 054268
                                        James J. Duffy
                                        Florida Bar Identification No. 68662
                                        **HOLLAND & KNIGHT LLP**
                                        777 South Flagler Drive, Suite 1900W
                                        West Palm Beach, FL 33401
                                        Telephone:  (561) 833-2000
                                        Facsimile:  (561) 650-8399
                                        E-mail: david.spector@hklaw.com
                                                nicholas.purvis@hklaw.com
                                                james.duffy@hklaw.com
                                                kim.roark@hklaw.com
                                        *Attorneys for State Farm Plaintiffs*

#71643375_v10